UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Bakery, Confectionery, Tobacco : Case No. 1:08-cv-152
Workers and Grain Millers :
International Union, Local 57, :
AFL-CIO, :
 :
    Plaintiff, :
 :
vs. :
 :
KBO, Inc., :
 :
    Defendant. :

**ORDER**

Before the Court is Defendant's motion for summary judgment. (Doc. 19) Plaintiff opposes the motion (Doc. 22), and Defendant has replied. (Doc. 25) Plaintiff's complaint seeks an order requiring Defendant to arbitrate the grievances of two of Plaintiff's members, former employees of Defendant who were terminated during a strike. Defendant contends that it is not required to arbitrate the grievances because, at the time the employees were terminated, no collective bargaining agreement was in effect that would require arbitration of the terminations.

**FACTUAL BACKGROUND**

Local 57 of the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, and KBO (a wholly-owned subsidiary of Klosterman Baking Company) were parties to a 2003 collective bargaining agreement. That agreement expired on

February 25, 2007. The 2003 CBA contained a grievance procedure that included arbitration, and also contained a no-strike clause. Local 57 and KBO began negotiating a new agreement before the 2003 CBA's expiration but were unsuccessful in reaching a new contract.

On February 27, Local 57 members struck KBO's Springfield, Ohio bakery. KBO utilized management personnel, temporary hires, and some union employees who resigned from the union and crossed the picket line, to keep the bakery operating. When the strike began, KBO ceased deducting union dues from its employees' paychecks. Those members who resigned from the union and crossed the picket line were paid under the 2003 CBA's agreed wage rates. The strike was apparently rather contentious, and was not resolved until April 9.

On March 15, two striking employees (Christopher Wilson and Eugene Anderson) were seen damaging the cars of two replacement workers. After reviewing a videotape of the incidents, KBO's Human Resources Director Tim McCoy terminated Wilson and Anderson the next day, March 16.

Local 57's Financial Secretary-Treasurer is Vester Newsome. According to Newsome's affidavit, he called Tim McCoy on March 19 about the terminations. His telephone log with an entry from March 19 is attached to his affidavit; the notes in his log state "Arbitration/Chris - Geno." Chris is Christopher Wilson, and

Geno is Eugene Anderson, the two terminated union members. Newsome states that he asked McCoy to reconsider the terminations, and that McCoy told him when the members return to work "... you can file a grievance and we will let an arbitrator decide." Newsome states that he agreed to McCoy's proposal. (Doc. 22, Exhibit 1, Newsome Affidavit at ¶5.)

Negotiations between the parties continued during the strike, including sessions held on March 7, March 21 and 22, and April 5. An agreement was reached on April 9, and after ratification the Local 57 employees returned to work on April 10. The new CBA was formally executed by Local 57 and KBO in late September, 2007. The 2007 CBA also contains arbitration and no-strike clauses. But the arbitration clause differs from that contained in the 2003 CBA; for example, it permits a single arbitrator, rather than three, to determine a grievance. (Article 15, Section B of the 2007 contract.)

After the return to work, Local 57 submitted grievances on behalf of Wilson and Anderson. The grievance forms are each dated April 13, 2007, and claim the employees were unjustly terminated in violation of Article 21, Section G of the contract. (Doc. 19, Attachment 9 to McCoy Affidavit, at pp. 135-136.) (Article 21 of both the 2003 and 2007 contracts is entitled "Management Rights" and Section G covers KBO's right to enforce rules of conduct, subject to the union's right to question those

-3-

rules through the grievance procedure.)  KBO's initial response, as noted on the grievance forms, was "no contract violation."  On August 10, 2007, J. Kronenberger, Klosterman's Vice President, denied the grievances.  McCoy confirmed that decision in an email to Newsome on September 5, stating the employees had been terminated for misconduct on the picket line.  A formal letter from McCoy followed on September 13, stating that the grievances were not subject to arbitration because the terminations took place after the 2003 contract expired.  (Doc. 19, Attachments 10 and 11 to McCoy Affidavit, at pp. 137-138.)

KBO contends, and Local 57 does not dispute, that the union did not file an unfair labor practice charge with the NLRB based on the terminations.  Local 57 filed its complaint in this case on March 4, 2008, contending that KBO violated the 2007 CBA by refusing to arbitrate the grievances.  The complaint alleges jurisdiction under Section 301 of the Labor-Management Relations Act, 29 U.S.C. §185.  (Doc. 1)

**ANALYSIS**

Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The party

opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968)). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution

since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations omitted).

Effective Date of the 2007 CBA.

KBO's motion argues that no labor contract was in effect when the two employees were terminated, and thus this Court cannot compel KBO to arbitrate their grievances. The 2003 CBA had expired, and a new contract was not agreed and entered into until April 9, 2007. It is of course axiomatic that arbitration is a matter of contract, and an employer cannot be required to submit a dispute to arbitration unless it has agreed to do so. See, e.g., AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986).

Local 57 does not dispute that the 2003 contract expired before the strike, and does not argue that the parties intended to extend that contract to cover the period of the strike. Local 57 contends that the 2007 CBA was in effect when the two employees were terminated and when their grievances were

submitted. Therefore it contends the 2007 CBA's arbitration provision applies. At the very least, Local 57 contends the 2007 CBA is ambiguous with respect to its effective date. Alternatively, Local 57 asserts the existence of a separate oral agreement between Local 57 and KBO to arbitrate the two grievances based upon the March 19 telephone call from Newsome to McCoy.

Strict application of the normal rules of contract construction is not required when considering labor contracts, given the overriding goal of federal labor law, to maintain industrial peace. See, e.g., Retail Clerks Int'l Ass'n, Local Unions Nos. 128 and 633 v. Lion Dry Goods, 369 U.S. 17, 28 (1962) [a Section 301 contract includes "any agreement between employers and labor organizations significant to the maintenance of labor peace between them."] An enforceable labor contract does not have to be reduced to writing, and a contract may exist on some issues even when other important terms remain in dispute. Conduct that manifests the parties' mutual intent to abide by agreed-upon terms will be sufficient to establish the existence of a labor contract. See, e.g., Bobbie Brooks, Inc. v. International Ladies Garment Workers Union, 835 F.2d 1164, 1168 (6th Cir. 1984), holding that a binding contract existed despite the lack of agreement on a key issue, the company's use of non-union production workers, when both parties implemented terms

that had been agreed to, especially some critical economic terms.

Here, there is no question that a contract existed; the question is when the 2007 CBA was effective. Local 57 relies on comparisons between the 2003 and 2007 agreements to argue that the parties intended the 2007 CBA to take effect on the date the 2003 CBA expired.

First, Local 57 notes that the 2003 agreement states it was "made and entered into" on March 6, 2003, but that its effective date was actually two weeks earlier, February 23, 2003, which happened to be the expiration date of the previous CBA. Since the same phrase "made and entered into" is also used in the 2007 agreement, Local 57 argues the phrase must reflect the parties' similar intent. Local 57 also notes that McCoy states in his affidavit that the 2003 CBA was "dated" February 23, 2003, when that contract states it was "made and entered into" on March 6.

Second, Local 57 cites Article 26 of the 2003 CBA, which stated "The contract shall be for four (4) years and expires February 25, 2007." Article 26 of the 2007 CBA states "The contract shall be for four (4) years and expires February 27, 2011 at midnight." Since the period from April 9, 2007 to February 27, 2011 cannot be "four years," Local 57 argues the effective date "must be" February 27, 2007 in order to give effect to Article 26.

As to the first argument: The phrase "made and entered into"

-8-

is not ambiguous.  The 2007 CBA does not contain any term or clause that states a different "effective" date.  KBO notes that contracts are often executed after the parties have actually reached agreement; in these situations, parties will utilize language such as "made and entered into **AS OF**" the date that agreement is intended to be effective.  Such contracts also often contain a separate term expressly stating the effective date.  Such was the case in <u>Local 377 v. Humility of Mary Health Partners</u>, 296 F.Supp.2d 851 (N.D. Ohio 2003), upon which Local 57 relies.  There, the parties' labor contract expired without a new agreement, and the union went on strike.  Two strikers were "arrested" by employer security guards for alleged violent conduct on the picket line.  During the contract negotiations, the union requested an "amnesty" agreement for the two strikers, which the employer rejected.  The parties reached a tentative agreement a short time later that the union ratified the next day, ending the strike.  After the return to work, the employer suspended the two employees, then terminated them for misconduct.  Their grievances were rejected because the incidents occurred during the strike when no contract was in effect, and the employer had rejected the union's amnesty request.

In the union's Section 301 suit, the district court granted the union summary judgment, finding that the new CBA was in effect during the strike because the parties had expressly agreed

that the new agreement's effective date would be retroactive to cover the strike period. The new CBA explicitly stated that the agreement "shall become effective" on the date that the previous contract terminated. The facts that the new contract was reached during the strike, or that it was not formally executed for seven months, were irrelevant. The district court noted the "well-settled principle of contract interpretation that a contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." Id. at 859 (citations omitted). Citing <u>Mail-Well Envelope v. Int'l Assoc. Of Machinists & Aerospace Workers</u>, 916 F.2d 344, 346 (6th Cir. 1990), the court held the parties were free to "back-date" the CBA to avoid a period in which the parties were without a contract, and to subject all strike-related conduct to the grievance terms of that new contract.

Here, the 2007 CBA lacks any such express language stating that the "effective date" is anything other than the date the contract was "made and entered into." The comparisons between the two CBAs upon which Local 57 relies are not sufficient to establish the parties' mutual intent or agreement to "back-date" the 2007 CBA, thereby negating the "made and entered into" date of April 9, 2007. There is no suggestion that during the 2003 negotiations that Local 57 struck KBO, or that KBO locked out the

union employees.  In addition, the 2003 contract expressly states that the new negotiated wages rates took effect on "2/23/03," the expiration date of the old contract, and not on "3/6/03" when agreement was reached.  (See Article 6 at p. 7)  In contrast, the 2007 contract's new wage rates expressly take effect at "ratification" (see Article 6); there is no evidence that KBO agreed to "back-date" the economic benefits reflected in that agreement.  The 2007 contract also reflects the fact that the parties negotiated and agreed upon various effective dates for different portions of the contract.  See, for example, Article 4, granting more limited vacation time to employees hired "after 2/23/03;" Article 16, stating that health and welfare benefits would not change from inception through December 31, 2007, but a new benefit plan would take effect January 1, 2008; Article 17 covering pension plan contributions, with increases at specified dates; and Article 18, an agreement to establish a mutually acceptable drug and alcohol testing policy by July 1, 2007. Given these specific terms, the contract's silence with respect to any back-dating of any term, particularly Article 15, cannot be read to reflect any mutual intent to make the contract retroactive.

Local 57's second argument concerns the references to a "four year" term.  The notes and counter-proposals exchanged during negotiations over the 2007 agreement clearly reflect that

Local 57 wanted a three-year contract, a demand that KBO rejected. When an agreement was finally reached on April 9, including agreement on "four years," no one apparently thought to calculate the precise number of years, months and days of the contract's term. Even so, the Court concludes that the phrase "four years" does not compel the conclusion that the parties intended to back-date the entire contract. First, the Court must construe the contract as a whole and attempt to reconcile any apparent conflicts in order to give effect to the intent of the parties. As long as a contract as a whole is coherent and consistent, any such inconsistencies can be resolved as a matter of law. See, e.g., International Union v. Yard-Man, Inc., 716 F.2d 1476, 1479-1480 (6th Cir. 1983), recognizing and applying traditional contract rules so long as they are consistent with federal labor policy. There is no other term in the 2007 CBA that can reasonably be understood as an agreement to back-date the contract or any provision of the contract. As noted above, the parties negotiated specific effective dates for several provisions, and it is unreasonable to assume that by using the phrase "four years" the parties intended to override the express term that the contract was "made and entered into this 9th day of April, 2007."

Local 57's "four year" argument also conflicts with the rule of construction that "specific terms and exact terms are given

greater weight than general language." See Restatement (Second) of Contracts, Section 203(c) (1981). The term "four years" could reasonably be measured in several ways, but the precise "entered into" date (April 9, 2007) and precise termination date (February 27, 2011) have one and only one meaning.

The Court therefore rejects Local 57's argument that the 2007 CBA was in effect during the strike, and requires KBO to arbitrate the two employee grievances.

The Oral Contract to Arbitrate the Grievances.

Local 57's alternate argument is that, irrespective of the terms of the 2007 CBA, Newsome and McCoy reached an oral contract to arbitrate the grievances at issue. It claims this specific agreement was reached during the March 19 telephone conversation between Newsome and McCoy, a few days after the employees were terminated.

As noted above, the existence of a valid labor contract "does not depend on its reduction in writing; it can be shown by conduct manifesting an intention to abide by agreed-upon terms." Bobbie Brooks, 835 F.2d at 1168 (citations omitted). In Int'l Brotherhood of Boilermakers, et. al. v. Transue & Williams, 879 F.2d 1388 (6th Cir. 1989), the Sixth Circuit rejected an employer's contention that the expiration of a prior CBA between the parties entitled the employer to reject arbitration. After the CBA expired, both parties adhered to the expired terms,

-13-

including its grievance arbitration clause.  The employer had accepted and responded to over 15 grievances during the negotiation period, and the union did not strike or picket but continued work at the previously negotiated contract wage rates.  The Sixth Circuit concluded that these facts evidenced a mutual intent to be bound to the arbitration provision despite the lack of a comprehensive written contract.  The court specifically noted that neither party had resorted to economic weapons (strike or lockout), acts that would be tantamount to rejecting an ongoing contractual relationship.

Here, in contrast, the parties' conduct was a clear repudiation of any ongoing contract.  The parties had not manifested any intent to resume their workplace relationship.  Against that backdrop, Local 57's evidence of the existence of an oral agreement consists of Newsome's affidavit about his telephone call to McCoy.  KBO points out that Newsome's purported "acceptance" of McCoy's "offer" lacks any consideration, as there is no evidence that KBO received any benefit from this alleged agreement.  Nor does the record reflect that this oral agreement was discussed or even mentioned during the continuing contract negotiations.  The subject of grievances and arbitration **was** discussed, however, as there are several references to competing proposals in the parties' notes of the negotiating sessions.

Moreover, even if Newsome and McCoy agreed to arbitrate the

-14-

two grievances, Local 57 does not address Article 25 of the 2007 CBA, the contract integration clause. That Article is entitled "Complete Agreement" and states:

> A.  <u>Everything Wrapped Up.</u>  The employer and the union have had ample opportunity to present for negotiations any subject desired.  This agreement represents a full economic and non-economic negotiated package for its duration.  Each, therefore, clearly and unmistakably waives for the remainder of the term of this agreement the right to require either party to negotiate on any subject, even though not now known, whether or not covered in this agreement and whether or not mentioned during negotiations.  This shall not be considered "boiler plate" or a routine "zipper clause."
>
> B.  <u>Fully Written</u>.  This agreement is complete in writing.  It may be amended only by a document in writing entitled 'Amendment to Labor Agreement' signed by the employer's President or authorized representative and by the union or authorized representative.  Such an amendment may be effective during the term of this agreement and may extend the term of this agreement.  This agreement does not operate to include, nor does it obligate the employer or union to continue to effect, any working condition, benefit or past practice which is not covered in this agreement.

(Doc. 19, Attachment 8 to McCoy Affidavit, at p. 134)

This integration clause is unambiguous; the contract contains all of the parties' agreements on "any subject desired," whether or not it was mentioned during negotiations.  The parties clearly negotiated over the 2007 arbitration clause, yet the contract is completely silent about any agreement concerning arbitration of the grievances of the two striking employees.

A similar situation was presented in <u>Local 377 v. Humility of Mary</u>, 296 F.Supp.2d 851 (N.D. Ohio 2003), discussed above and upon which Local 57 relies. There, however, it was the employer who insisted that, despite the parties' express agreement to back-date the CBA to cover the period of the strike, and despite the contract's unambiguous integration clause, it was entitled to reject arbitration of striker grievances because it had refused to grant "amnesty" for strikers during negotiations. The district court rejected the employer's argument, noting that "Carefully written, well-reasoned, and thoroughly negotiated contracts are presumptively complete, and the added presence of a merger clause is further strong evidence that the parties intended the writing to be the complete and exclusive agreement between them." <u>Id</u>. at 860-861 (internal citations and quotations omitted). Since the parties had expressly agreed to an effective date that covered the strikers' conduct, and because the grievance clause applied to that conduct, the district court held that the employer was required to arbitrate the grievances.

Here, in contrast, there is no evidence that the subject of striking workers in general, or the two grievances in particular, was discussed during negotiations. The 2007 CBA is silent on this subject, and the integration clause is the best evidence that the parties intended the written contract to reflect their entire agreement. Therefore, the Court concludes that KBO is not

obligated to arbitrate the two employee grievances based upon the alleged oral agreement.

## CONCLUSION

For all of the foregoing reasons, the Court hereby grants Defendant KBO, Inc.'s motion for summary judgment. (Doc. 19) Plaintiff's complaint is hereby dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: April 1, 2009        <u>s/Sandra S. Beckwith</u>
Sandra S. Beckwith
Senior United States District Judge